UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES #1-6, on behalf of themselves
and all others similarly situated,

                                          File No. 2:16-cv-13137

              Plaintiffs,

v.                                 Hon. Robert H. Cleland

RICHARD SNYDER, Governor of the        Mag. J. David R. Grand
State of Michigan, and COL. KRISTE
ETUE, Director of the Michigan State
Police, in their official capacities,

              Defendants.

_____

### PLAINTIFFS' SECOND AMENDED
### VERIFIED CLASS ACTION COMPLAINT

## Introduction

1.  This class action is brought on behalf of individuals subject to registration under Michigan's Sex Offenders Registration Act (SORA), M.C.L. § 28.721 *et seq.*, seeking declaratory and injunctive relief for violations of their constitutional rights.

2.  Almost two years ago, in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *cert denied,* 138 S. Ct. 55 (2017) ("*Does I*"), the Sixth Circuit Court of Appeals held that SORA imposes punishment and that retroactive application of SORA's 2006 and 2011 amendments violates the U.S. Constitution's Ex Post Facto Clause.

3.  Nevertheless, the State of Michigan continues to subject tens of thousands of registrants to retroactive punishment under SORA.

4.  More than three years ago, this Court held (1) that SORA's prohibitions on working, residing, or loitering in exclusion zones are unconstitutionally vague; (2) that certain of SORA's reporting requirements are unconstitutionally vague; (3) that imposing strict liability for SORA violations violates due process (and therefore SORA therefore must be read to incorporate a knowledge requirement); and (4) that the requirement to report certain electronic identifiers immediately violates the First Amendment. *See Does #1-5 v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015).

5.  In a subsequent opinion, *Does #1-5 v. Snyder,* 101 F. Supp. 3d 722 (E.D. Mich. 2015), this Court further held that the retroactive incorporation of the life-time registration obligation to report certain electronic identifiers also violates the First Amendment.[1]

6.  Nevertheless, the State of Michigan continues to subject tens of thousands of registrants to these unconstitutional provisions.

7.  The plaintiffs, on behalf of themselves and all others similarly situated, now seek to ensure that all affected Michigan registrants will not suffer unconstitutional

---

[1] The Sixth Circuit reversed this Court's earlier decision, which had granted the state's motion to dismiss as to the plaintiffs' ex post facto claim. *See* 932 F. Supp. 2d 803 (E.D. Mich. 2013), *reversed by* 834 F.3d 696 (6th Cir. 2016). The Sixth Circuit did not reach the issues decided by this Court in its twin 2015 decisions.

retroactive punishment in violation of the Sixth Circuit's decision in *Does I*; will not be subjected in the future to SORA provisions found to be unconstitutional by this Court; and will be treated uniformly and consistently statewide.

8.  To effect that relief, the plaintiffs seek to certify a class of Michigan registrants, all of whom seek to have the benefits of this Court's 2015 forward-looking decisions applied to them (the "primary class").

9.  The plaintiffs also seek to certify an "ex post facto subclass" comprised of individuals who committed the offense or offenses requiring registration before April 12, 2011, all of whom seek to have the benefits of the Sixth Circuit's backward-looking decision applied to them.

## JURISDICTION AND VENUE

10.  Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because the plaintiffs seek redress under 42 U.S.C. § 1983 for the deprivation of rights secured by the United States Constitution.

11.  The plaintiffs' requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, by Fed. R. Civ. P. 57 and 65, and by the legal and equitable powers of this Court.

12.  Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

### Plaintiffs[2]

### John Doe #1

13.  Plaintiff John Doe #1 resides in the Eastern District of Michigan.

14.  In early 2000, when Mr. Doe #1 was a 19-year-old senior in high school, he had a sexual relationship with a 14-year-old freshman girl.

15.  After school one day the two went to Mr. Doe #1's house and had sexual intercourse. The police arrested Mr. Doe #1 about a week later, and he admitted to them that he had sex with the girl.

16.  The girl gave various statements to the police, initially saying that the sex was not consensual, but later stating that that while she felt pressured to have sex, Mr. Doe #1 did not force her or threaten her to perform any sexual acts.

17.  After Mr. Doe #1's attorney explained to him that the girl could not legally give consent because she was underage, Mr. Doe #1 pled guilty in June 2000 to criminal sexual conduct in the third degree (attempt) under the Holmes Youthful Trainee Act (HYTA), a record-sealing statute that allows young offenders to have their cases dismissed and their records sealed. *See* M.C.L. § 762.1 *et seq.*

---

[2] Declarations verifying the facts in this complaint are attached as Exhibits A-F. The previously filed First Amended Complaint, ECF #8, named two plaintiffs. The individual identified in that complaint as John Doe #1 is now identified as John Doe #6. The individual identified in that complaint as John Doe #2 has withdrawn from this litigation.

18. Mr. Doe #1 was sentenced to 60 days in jail, of which he served a little over a month, and three years of probation.

19. In the summer of 2001, Mr. Doe #1 attended a volleyball game at his former high school with a friend, to cheer for the friend's sister. At the game, Mr. Doe #1 saw the victim from his case and immediately left the premises. He reported the incident to his probation officer.

20. Mr. Doe #1 knew that he was not allowed any contact with the girl, but was unaware that he was prohibited from going to the school. Mr. Doe #1's HYTA status was revoked in May 2001 as a result of his having attended the volleyball game, and his probation was extended for two more years.

21. Mr. Doe #1 completed probation in June 2005.

22. Mr. Doe #1 was approximately four years six months older than the girl with whom he had sex. Had the age difference been less than four years, Mr. Doe #1 would not be subject to sex offender registration. M.C.L. § 28.722(w)(iv).

23. Mr. Doe #1 has no other criminal convictions.

24. SORA's amendments, including those in 2006 and 2011, have been applied retroactively to Mr. Doe #1. Before 2011, Mr. Doe #1 was required to comply with SORA for twenty-five years. In 2011, he was retroactively classified as a Tier III offender and his registration term was extended to life.

25. Even after the *Does I* decision, the defendants have required Mr. Doe #1 to

5

comply with all of the provisions of SORA including the 2006 and 2011 amend-
ments, have labeled him as a Tier III offender, and have subjected him to lifetime
registration.

### John Doe #2

26.  Plaintiff John Doe #2 resides in the Eastern District of Michigan.

27.  In the early 2000s, Mr. Doe #2's father and stepmother divorced. Not long
after the divorce or separation, Mr. Doe #2's stepmother accused him of having
engaged in sexual activity with her daughter (his stepsister) during the 1990s, when
he was a teenager.

28.  Mr. Doe #2 denied the allegations, but facing three counts of criminal sexual
conduct in the first degree, in May 2004 on the advice of counsel he pled guilty to
one count of criminal sexual conduct in the third degree under HYTA. *See* M.C.L.
§ 762.1 *et seq.* He successfully completed HYTA in 2007, after serving probation,
and his charges were dismissed.

29.  HYTA provides that if a youth between the ages of 17 and 24 pleads guilty,
the court "without entering a judgment of conviction" may assign that individual to
the status of youthful trainee." M.C.L. § 762.11(1). If the youth completes the
trainee period – typically a period of probation – then "the court shall discharge the
individual and dismiss the proceeding." M.C.L. § 762.14(1).

30.  An assignment to youthful trainee status "is not a conviction for a crime."

M.C.L. § 762.14(2). Moreover, "all proceedings regarding the disposition of the criminal charge and the individual's assignment as youthful trainee shall be closed to public inspection," M.C.L. § 762.14(4), meaning that court records in HYTA cases are sealed and do not appear on the person's criminal history.

31. Mr. Doe #2's dismissed charges do not appear on a background check. Under SORA, however, Mr. Doe #2 is publicly labeled as a *convicted* sex offender even though his case was dismissed and he has no criminal record.

32. SORA is not limited to convicted people, but requires registration and reporting by people who were never convicted of a crime, such as Mr. Doe #2.

33. Mr. Doe #2 has no other sexual offenses. He has two misdemeanors for operating while impaired.

34. SORA's amendments, including those in 2006 and 2011, have been applied retroactively to Mr. Doe #1. Before 2011, Mr. Doe #2 was required to comply with SORA for twenty-five years. In 2011, he was retroactively classified as a Tier III offender and his registration term was extended to life.

35. Even after the *Does I* decision, the defendants have continued to require that Mr. Doe #2 comply with all of the provisions of SORA including the 2006 and 2011 amendments, to label him as a Tier III offender, and to subject him to lifetime registration.

**John Doe #3**

36. Plaintiff John Doe #3 resides in the Western District of Michigan.

37. Mr. Doe #3, raised by adoptive parents, was born with Fetal Alcohol Syndrome (FAS), an incurable birth defect resulting from in-utero alcohol exposure.

38. Mr. Doe #3's in-utero alcohol exposure left him with various neurological deficits. He has a developmental age of nine or ten, and an IQ of approximately 84.

39. Mr. Doe #3's developmental delays make him vulnerable, and in the early 1990s he was sexually assaulted by a co-worker.

40. In the summer of 1994, Mr. Doe #3 was accused of engaging in inappropriate sexual touching of his six-year-old nephew. At the time, Mr. Doe #3 had a chronological age of 21.

41. Several psychologists provided detailed testimony that Mr. Doe #3's actions were similar to that of a child, and that given his level of developmental and intellectual functioning, his actions should be viewed as those of a child engaged in sexual experimentation, which is common. Mr. Doe #3 had no history of related behavior.

42. Mr. Doe #3 pled nolo contendere in December 1994 to three counts of criminal sexual conduct in the second degree. He was sentenced to 90 days, as well as five years' probation, which he successfully completed without incident.

8

43. When Michigan's first Sex Offenders Registration Act came into effect in October 1995, Mr. Doe #3 was placed on a non-public law enforcement registry, and was required to update his address with law enforcement if he moved. He was subject to registration for 25 years.

44. SORA's various amendments have been retroactively applied to him, including the 1999 amendments extending his registration period to life and the 2006 amendments subjecting him to exclusion zones. In 2011, Mr. Doe #3 was retroactively classified as a Tier III offender.

45. Mr. Doe #3 has no other criminal history.

46. Even after the *Does I* decision, the defendants have continued to label Mr. Doe #3 as a Tier III offender and to require him to comply with all of the provisions of SORA, including its 2006 and 2011 amendments.

### John Doe #4

47. Plaintiff John Doe #4 resides in the Western District of Michigan.

48. Starting around 2009, when Mr. Doe #4 was in his early 20s, he began flirting by text with an underage girl. The two eventually started dating, and they had a relationship for about three years. Because Mr. Doe #4 was in college, they did not see each other often.

49. The girl's parents did not approve of their relationship. In 2012, when the girl was 17, Mr. Doe #4 was interviewed by the police about whether he had sexual

9

contact with his girlfriend before she turned 16.

50. Mr. Doe #4 admitted to the police that he and his girlfriend had had oral sex, but maintained that this did not occur until after the girl was 16 years old. He said they did not have sexual intercourse.

51. The offense allegedly occurred in 2010, shortly before the girl's sixteenth birthday.

52. In 2013, Mr. Doe #4 pled guilty to sexual misconduct in the fourth degree. He took this plea agreement after the prosecutor threatened to bring child pornography charges based on the fact that Mr. Doe #4 and his girlfriend had exchanged nude photos via text messages. Mr. Doe #4 admitted that he had the photos.

53. Mr. Doe #4 served 10 days in jail, and was placed on probation for five years.

54. Under SORA, Mr. Doe #4 must register for 25 years, and is labeled as a Tier II offender.

55. Mr. Doe #4 has no other criminal convictions.

56. Even after the *Does I* decision, the defendants have continued to require Mr. Doe #4 to comply with all of the provisions of SORA including the 2011 amendments, even though his offense preceded those amendments. The state has also continued to label him as a Tier II offender.

**John Doe #5**

57. Plaintiff John Doe #5 resides in the Eastern District of Michigan.

58. In November 2006, when Mr. Doe #5 was living in Omaha, Nebraska, he developed a relationship with boy who was 14 or 15 at the time. The two engaged in sexual touching. Mr. Doe #5 was convicted of sexual assault of a child, Nebraska Rev. Statute 28 – 320.01.

59. Mr. Doe #5 was sentenced to 18 months of incarceration. He was informed that under Nebraska law, he would be required to register as a sex offender for ten years.

60. In 2010, Mr. Doe #5 moved to Michigan to be closer to his family. Under Michigan's SORA, he was subject to registration for 25 years.

61. In 2011, Mr. Doe #5 was retroactively classified as a Tier III offender and his registration term was extended to life.

62. Mr. Doe #5 has no other criminal convictions.

63. Even after the *Does I* decision, the defendants have continued to require Mr. Doe #5 to comply with all of the provisions of SORA, including the 2011 amendments, to label him as a Tier III offender, and to subject him to lifetime registration.

**John Doe #6**

64. Plaintiff John Doe #6 resides in the Eastern District of Michigan.[3]

65. In December 2015, Mr. Doe #6 pled nolo contendere to criminal sexual conduct in the fourth degree for engaging in unwanted sexual contact with a waitress who worked in a restaurant he owns. Mr. Doe #6 believed the sexual touching was consensual.

66. Mr. Doe #6 received no jail time, but was sentenced to five years of probation. He has no other criminal convictions.

67. Under SORA, Mr. Doe #6 is classified as a Tier I offender, and is subject to SORA for 15 years.[4]

**Defendants**

**Governor Richard Snyder**

68. Defendant Richard Snyder is the Governor of Michigan. He is sued in his official capacity.

69. Pursuant to Article 5, § 1 of the Michigan Constitution, the executive power of the state is vested in the governor. The Michigan Constitution further provides that the governor shall take care that applicable federal and state laws are faithfully executed. Mich. Const., Art. 5, § 8.

---

[3] John Doe #6 was identified as John Doe #1 in the original complaint.
[4] As a Tier I registrant, Mr. Doe #6 is not listed on the public sex offender registry. M.C.L. § 28.728(4)(c).

70. Defendant Snyder is ultimately responsible for the enforcement of the laws of this state, and for supervision of all state departments, including the Michigan State Police.

71. The Governor is an appropriate defendant in a case challenging the constitutionality of a state statute.

## Colonel Kriste Etue

72. Defendant Colonel Kriste Etue is the director of the Michigan State Police. She is sued in her official capacity.

73. The Michigan State Police maintains Michigan's sex offender registry. M.C.L. § 28.721 *et seq.*

74. The State Police's responsibilities include enforcing SORA, maintaining the state's database of sex offenders, maintaining an online public sex offender registry, registering offenders (along with other law enforcement agencies), developing registration forms, providing statutorily required notices to registrants, collecting registration fees, and coordinating with national law enforcement and the national sex offender registry. *See* M.C.L. §§ 28.724, 28.724a, and 28.725 *et seq.*

75. The director of the Michigan State Police is an appropriate defendant in a case challenging the constitutionality of Michigan's SORA.

## FACTS

### History of the Michigan Sex Offender Registration Act

76.  Today SORA imposes obligations, disabilities, and restraints that are so extensive that the Sixth Circuit found them to be punishment. Those obligations, disabilities, and restraints, which are too extensive to be set out in full here, are listed in Exhibit G, incorporated by reference.

77.  It was not always so. Michigan passed its first sex offender registration law in 1994. Mich. Pub. Act 295 (1994) (eff. 10/1/95). Before that time, Michigan did not require anyone to register as a sex offender for any purpose.

78.  The 1994 statute established a *private law enforcement* database containing basic information about people convicted of sex offenses. Registration information was exempt from all public disclosure. The statute did not require regular verification or reporting.

79.  After the initial registration was completed, the only additional obligation was to notify local law enforcement within 10 days of a change of address. The registrant did not need to notify law enforcement in person. Mich. Pub. Act 295, Sec. 5(1) (1994). Registry information was maintained for 25 years for individuals convicted of one offense and for life for individuals convicted of multiple offenses. Mich. Pub. Act 295, Sec. 5(3)-(4) (1994).

80.  Since that time, the legislature has repeatedly amended the statute, each time

imposing a stricter regime with new burdens on registrants, covering more people and more conduct. The 2006 and 2011 amendments are particularly relevant here.

81. The 2006 amendments (effective 1/1/06) retroactively barred registrants (with limited exceptions) from working, residing, or loitering within 1000 feet of school property, and imposed criminal penalties for noncompliance. Mich. Pub. Acts 121, 127 (2005). In addition, the penalties for registration-related offenses were increased. Mich. Pub. Act 132 (2005). Another amendment, which was also applied retroactively, allowed subscribing members of the public to receive electronic notification when a person registers or moves into a particular zip code. Mich. Pub. Act. 46 (2006).

82. In 2011, SORA underwent major revisions which fundamentally changed Michigan's sex offender registry. Mich. Pub. Act. 17-18 (2011).

83. First, the 2011 SORA amendments (effective 4/12/11) retroactively imposed extensive reporting requirements, requiring in-person and in some cases immediate reporting of vast amounts of personal information.

84. Second, the 2011 amendments retroactively categorized registrants into tiers. The tier classification determines the length of time a person must register and the frequency of reporting. Tier classifications are based solely on the offense of conviction. Tier classifications are not based on, and do not correspond to, a registrant's actual risk of re-offending or the danger any registrant poses to the public.

15

85. Before 2011, most Michigan registrants were required to register for 25 years. As a result of the retroactive tier classifications, many registrants had their registration periods extended to life. There was no individualized determination about their risk or whether lifetime registration was warranted.

## The *Does I* Litigation

86. In 2012, six Michigan registrants (who are not plaintiffs in this case) challenged the constitutionality of SORA on numerous grounds. *See Does v. Snyder*, Case No. 2:12-cv-11194 (E.D. Mich.).

87. The state moved to dismiss. This Court granted the motion in part and denied the motion in part. *See Does #1-4 v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013). The dismissal included the plaintiffs' ex post facto claim.

88. After discovery, this Court issued two opinions under Rule 52, *Does #1-4 v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013), and *Does #1-5 v. Snyder*, 101 F. Supp. 3d 722 (E.D. Mich. 2015). Those opinions held, *inter alia*, that:

   a. SORA's geographic exclusion zones are unconstitutionally vague;
   b. SORA's prohibition on loitering is unconstitutionally vague;
   c. Certain of SORA's reporting requirements are unconstitutionally vague;
   d. Certain of SORA's internet reporting requirements violate the First Amendment; and
   e. SORA must be read to incorporate a knowledge requirement, so that there is no strict liability for SORA violations.

89. On appeal, the Sixth Circuit held that SORA is punishment and that retro-

16

active application of the 2006 and 2011 amendments violates the Ex Post Facto

Clause. *See Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016).

90.  The Sixth Circuit did not vacate this Court's other rulings, but rather

declined to reach those issues as "none of the contested provisions may now be

applied to the plaintiffs in this lawsuit." *Id.* at 706.

91.  The state defendants petitioned for certiorari. That petition was denied. *See*

*Snyder v. John Does #1-5*, 138 S. Ct. 55 (2017).

### The State's Has Failed to Amend SORA to Bring It Into Compliance with the Decisions in *Does I*

92.  The Michigan legislature has not amended SORA to bring it into compliance

(a) with the Sixth Circuit's *Does I* decision of 2016, or (b) with this Court's two

*Does* decisions of 2015.

93.  The statute continues to require that pre-2006 registrants must comply with

the 2006 amendments; that pre-2011 registrants must comply with the 2011

amendments; that registrants must comply with prohibitions on residing, working,

or "loitering" within 1000 feet of a school (which this Court found to be uncon-

stitutionally vague); that registrants must comply with reporting requirements

(which this Court found to be unconstitutionally vague or in violation of the First

Amendment); and that registrants are strictly liable for certain SORA violations.

94.  Since the Sixth Circuit's decision in *Does I*, several meetings of a legislative

work group have been held to discuss amending SORA to bring it into compliance

17

with *Does I*, as well as to address other concerns about the statute's overbreadth and ineffectiveness. No legislation has yet been proposed. Some Michigan legislators have indicated to members of the legislative work group that they are reluctant to advocate publicly for registry reform, given the political costs of doing so, and would prefer that the courts resolve this issue for them.

95.  The defendants have continued in practice to require plaintiffs John Does #1-6 and similarly situated registrants (other than the plaintiffs in *Does I* and other civil actions) to comply with the provisions of SORA that this Court and the Sixth Circuit found to be unconstitutional in 2015 and 2016.

### The State's Continued Retroactive Enforcement of the 2006 and 2011 Amendments

96.  Under the Sixth Circuit's decision in *Does I*, the following SORA amendments cannot be applied retroactively:

a.  the 2006 amendments that bar registrants from residing, working, or loitering within 1000 feet of a school;
b.  the 2006 amendments that allow subscribing members of the public to receive electronic notifications about registrants;
c.  the 2011 amendments that categorize registrants into tiers and lengthen their registration terms; and
d.  the 2011 amendments requiring Michigan's internet-based, public registry to label registrants by tier level;
e.  the 2011 amendments requiring extensive reporting and in-person, immediate reporting.

97.  Nevertheless, the defendants have continued to apply these SORA provisions retroactively to plaintiffs John Does #1-6, and to members of the putative ex

post facto subclass defined below. The defendants continue to require registrants whose offenses predate the 2006 amendments, including plaintiffs John Does #1-3, to comply with the exclusion zones, and the Michigan State Police public sex offender registry continues to allow the public to subscribe to electronic notifications about them.

98. The defendants continue to categorize registrants whose offenses predate the 2011 amendments, including plaintiffs John Does #1-5, into tiers. The defendants continue to publicly label them by tier on Michigan's internet-based public registry; continue to apply the retroactively lengthened registration terms to them; and continue to require them to comply with the extensive reporting requirements adopted in 2011.

99. When plaintiffs John Does #1-6 and members of the putative class register, the registering agency is supposed to provide them with a Michigan Sex Offender Verification/Update Form, which serves as proof of their registration. This form also includes an Explanation of Duties to Register as a Sex Offender, which summarizes the requirements of SORA with which the registrant must comply. *See* Exhibit H (samples of verification forms that the six plaintiffs were given at recent registration visits).

100. Upon information and belief, the state provides the same Explanation of Duties form to everyone. This means that plaintiffs John Does #1-5, and the mem-

bers of the putative ex post facto subclass, get the same form as registrants whose offenses post-date the 2011 SORA amendments.

101.  The Verification/Update Form states the registrant's tier classification and notes that the length of the person's registration is based on that tier classification.

102.  The Explanation of Duties notifies registrants they are subject to criminal prosecution and punishment if they do not comply with certain SORA requirements that were part of the 2006 and 2011 SORA amendments. *See* Exhibit H.

103.  Specifically, the Explanation of Duties informs registrants that:

   a. "Unless otherwise specified by law," they are "prohibited by law from residing or working within 1,000 feet from any building, facility, structure or real property owned, leased, or otherwise controlled by a public, private, denominational, or parochial school offering developmental kindergarten, kindergarten, or any grade from one through twelve."
   b. They are "prohibited by law from loitering within 1,000 feet from any building, facility, structure or real property owned, leased, or otherwise controlled by a public, private, denominational, or parochial school offering developmental kindergarten, kindergarten, or any grade from one through twelve."
   c. The length of their registration period is determined by their tier classification; if they are Tier III registrants they must register for life. They must comply with the extensive and immediate in-person reporting requirements, such as providing information about travel, electronic identifiers, and employers.

*See* Exhibit H.

104.  Under the Sixth Circuit's decision in *Does I*, all of these statements are

false because these provisions cannot be applied retroactively consistent with the Ex Post Facto Clause.

**The State's Continued Enforcement of SORA's Vague Exclusion Zones**

105. Under SORA, the plaintiffs are barred from residing, working, or "loitering" within a "student safety zone." M.C.L. §§ 28.733-735.[5]

106. This Court held in 2015 that SORA's prohibitions on residing, working, and loitering within an exclusion zone are unconstitutionally vague.

107. Nevertheless, the defendants continue to require all registrants, including the plaintiffs, to comply with these SORA provisions, and have failed to amend the requirements in the Explanation of Duties provided to all registrants. *See* Exh. H.

108. The State of Michigan does not make maps available to the public showing where the exclusion zones are located or what their boundaries are.

109. The exclusion zones cover vast areas, especially in urban and suburban regions. In some small towns with centrally located schools, nearly the whole town – or at least the residential areas – can be within 1000 feet of a school.

110. Because exclusion zones are measured as the crow flies, rather than as people actually travel between two points, some exclusion zones – like those that encompass a river or an interstate highway – cover areas that are within 1000 feet of a school as the crow flies but that would require a person to walk or drive many

_____

[5] Plaintiff John Doe #2 is exempt from the school exclusion zones because he was not convicted of a crime but was adjudicated under HYTA. M.C.L. § 28.736(1)(c).

times that distance to actually get from the residence or workplace to the school.

111.  Exclusion zones put a significant percentage of the area of cities and towns off-limits. As a result, exclusion zones severely restrict access to employment and housing, and limit registrants' ability to engage in normal human activity.

112.  It is impossible for ordinary people to identify the areas that are inside and outside the exclusion zones. The task is difficult even for experts with sophisticated mapping technology. Distances are difficult to estimate or measure and property boundaries are difficult to locate. Moreover, exclusion zones often have irregular shapes, because they are measured from property boundaries and some zones overlap. Exclusion zones are not shaped like simple circles around a fixed point.

113.  It is impossible for the plaintiffs to comply with the prohibition on "loitering," which requires moment-to-moment knowledge of whether or not they are in an exclusion zone.

114.  Plaintiff John Doe #1 has been employed for six years in a manufacturing plant. Employees are frequently transferred from one plant to another. Mr. Doe #1 prefers staying at the plant he currently works at because it does not fall within an exclusion zone. But he does not have the option to refuse to be transferred. If he refuses, he risks discipline or being fired. He believes that some of his employer's plants may fall within exclusion zones, and fears that he could be transferred, either temporarily or permanently, to a different plant that might be in an exclusion

22

zone. Mr. Doe #1 worries that he could lose his job, and worries about finding new work outside an exclusion zone if he does.

115.   SORA's exclusion zones have also made it difficult for Mr. Doe #1 to determine where he can live. Despite using Google maps, he is often unsure whether a particular property is or is not within an exclusion zone.

116.   Plaintiff John Doe #3 has worked in a variety of jobs, such as food service, event set-up, and custodial services. He has repeatedly been let go when an employer learned that he was on the registry. He then had to look for new work.

117.   When applying for jobs, Mr. Doe #3 has to figure out whether he is legally permitted to work there, which can be difficult. Every time he applies for work he first has to go to the police station to try to find out whether the job is within an exclusion zone. His local police department determines this by checking with the state police.

118.   In some of Mr. Doe #3's jobs, his employers have assigned him to various locations, but he does not know whether those locations are within exclusion zones or how long he can work in any one location before being in violation of SORA. For example, he was representing a developmental disabilities organization at an event, when he realized that he might be within an exclusion zone, and so he left.

119.   In 2017, Mr. Doe #3 married a woman who also has Fetal Alcohol Syndrome and who lives with her parents. Mr. Doe #3 is uncertain whether his wife's

parents' home is within an exclusion zone, and does not know when or how often

he can visit her without being in violation of SORA.

120.  Plaintiff John Doe #4 had found it difficult or impossible to identify the

locations and boundaries of exclusion zones, which has affected his employment.

He works in construction and is often assigned to different jobs sites. When he is

asked to work at a new job location, he makes his best effort to check if the job site

falls within an exclusion zone by using Google Maps. But it is often impossible to

figure out whether or not a job site is within a zone.

121.  Sometimes Mr. Does #4 goes to a job site – and those sites can be located

several hours away – only to find when he arrives that the site is close to a school.

He then cannot take on the assignment his employer has given him, and must go

home, which costs him income and creates problems for his employer. Mr. Doe #4

was unable to tell in advance using Google Maps that these sites were off limits.

122.  When Mr. Doe #4 was looking for a home, it was difficult or impossible

for him to determine whether potential homes were within exclusion zones. For

example, one home was within 1000 feet of a school bus yard, and Mr. Doe #4 was

unsure, despite internet research, whether he could live in that home. He also had

difficulty determining whether homes were or were not within 1000 feet of a

school.

123.  Plaintiff John Doe #5 has been unable to determine what he can and cannot

do within exclusion zones. For a while he dated a person who lived in an exclusion zone; he inquired with the police whether he could visit during times when school is not in session, but was told he could not.

124.  Mr. Doe #6 lived with his wife and children in an apartment that was attached to a restaurant that the family had owned and operated for years. At his probation interview he was told that he could not work at the restaurant or live with his wife and children because the structures were within an exclusion zone.

125.  Mr. Doe #6 wants to visit his family during the day (and sometimes does so) but he is unsure how much time he can spend with his wife and children before he is in violation of SORA.

126.  Mr. Doe #6 has moved twice in the last two years and his wife has to put in extra hours at the restaurant because he is forbidden from working there.

**The State's Continued Enforcement of SORA's Vague Loitering Provision**

127.  SORA severely impairs the plaintiffs' and putative class members' family relationships and parenting, in large part because the statute bars them from "loitering" within 1000 feet of school property, and the plaintiffs do not know what that provision means. M.C.L. § 28.734.

128.  SORA defines "loiter" as "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. § 28.733(b). This provision contains

no exception for registrants who are parents spending time with their own children, or who are observing or accompanying the children of friends or family members.

129.  Because of the vagueness of SORA's loitering provision, the plaintiffs and putative class members cannot know if or how SORA applies to their parenting activities, to their relationships with other young family members, or to other interactions with children. The plaintiffs and putative class members are unsure what actions are unlawful under SORA's loitering prohibition.

130.  Due to this uncertainty, the plaintiffs and putative class members do not attend or are fearful of attending parent-teacher conferences and other school events. They are uncertain about where they can or cannot take their children, or whether they can pick their children up from school. They are unable to decipher which of their children's events they can or cannot attend, and live in fear of prosecution for misunderstanding the requirements.

131.  Plaintiff John Doe #1 is unable to attend his son's school-sponsored sporting events for fear that doing so would violate SORA. Doe #1's six-year-old son plays multiple sports, and games and practices are generally held at his elementary school. Mr. Doe #1 has not been able to attend any of these events, because he has been unable to determine whether watching one of these events would constitute loitering.

132.  In April 2018, Mr. Doe #1 contacted the local prosecutor's office to ask if

he could be prosecuted for attending his son's games. The office refused to provide an official answer and redirected him to the Sex Offenders Registration Unit of the Michigan State Police. When Mr. Doe #1 contacted the MSP Sex Offenders Registration Unit, that office similarly refused to provide an official answer and referred him back to local law enforcement.

133.  Mr. Doe #1 also avoids attending his son's school events, such as a father-son breakfast, a holiday concert, a school carnival, and field trips, because he does not know whether doing so would be a crime under SORA. Mr. Doe #1 has been asked to coach his son's baseball team, but declined to avoid the risk that he would be violating SORA's loitering prohibition.

134.  Plaintiff John Doe #3 does not have children of his own, but is close with his extended family. He is unsure whether he can attend high school sports events, concerts, other school events, or graduations of family members. He is also is uncertain whether he can go to his local public library (because it is within 1000 feet of a school).

135.  Plaintiff John Doe #4 is unsure what activities are or are not permitted under the loitering provision. He would like to but does not attend church because there is a Sunday school there. He does not attend sports or school events for his nephews, nieces, or friends' kids on school property, because he does not know whether he can.

136.  Mr. Doe #4 has a very large family, and they sometimes hold their Christmas celebration in a hall. The family learned that their 2017 venue fell within an exclusion zone only one day before the event, and feared that this meant Mr. Doe #4 could not participate. The family lost their security deposit, and had to settle for a less desirable location, so that Mr. Doe #4 could attend.

137.  Mr. Doe #4 wants to become a father in the future, and his biggest concern about being on the registry is that he will not be able to participate in his children's events, or even know whether he can or cannot participate.

138.  Plaintiff John Doe #5 does not have children. However, he fears daily that he will inadvertently violate one of the SORA provisions regarding his exclusion from school zones due to there not being a map he could reference to be certain. He often worries that he may be in a school zone unintentionally and be subject to prosecution because of it.

139.  Plaintiff John Doe #5 often takes walks, but he does not have any idea of precisely where the school exclusion zones begin or end. He refrains from walking outside of places where he knows the neighborhood, because he might stop at a park or a bench and only later realize that it was close to a school.

140.  Plaintiff John Doe #6 has daughters who are 14 and 16. He used to attend parent-teacher conferences and school events like band concerts. Now he does not go on to school property because he is afraid he will be accused of "loitering" in a

school safety zone. He is even anxious about picking up his girls off school property since he does not know whether doing so might violate SORA's safety zone provisions.

## The State's Continued Enforcement of SORA's Vague Reporting Requirements

141.  This Court held in 2015 that SORA's provisions requiring reporting of telephone numbers, electronic mail and instant message addresses, and vehicle information were unconstitutionally vague.

142.  Nevertheless, the defendants continue to require the plaintiffs and putative class members to comply with those SORA provisions. The Explanation of Duties informs registrants that they must provide information about telephone numbers that they "routinely use," electronic address or instant message address that they "routinely use" and information about vehicles they "regularly operate." *See* Exhibit H.

143.  SORA's requirements for reporting personal information are so vague that the plaintiffs and putative class members do not understand what information must be reported, or what changes in information subject them to the in-person immediate reporting requirement. The John Doe plaintiffs and putative class members cannot know whether or not they are in violation of the law. Moreover, different law enforcement agencies in different places apply SORA's requirements differently.

144.  Plaintiff John Doe #1 has gotten conflicting information about what he must report. For example, at one point his family planned a trip to Disney World in Florida. He was unable to attend, however, due to his uncertainty of the SORA statute and its application in other states.

145.  Plaintiff John Doe #2 isn't sure what information he must report and he has gotten conflicting information about what he must report. For example, when he wanted to go on a cruise departing from a Florida port, local law enforcement in Michigan told him he would have to report immediately and daily to the authorities in Florida, and that because he would be out of Michigan for more than seven days he would have to report in advance where he was going to be staying.

146.  Mr. Doe #2 was booking his lodging through Priceline in order to get last-minute deals and didn't know in advance where he would be staying (at either end of the cruise).

147.  Ultimately the state police overrode local enforcement and said he could go to Florida without knowing in advance where he would be staying, and Florida authorities told him he didn't need to register if he was only going to be in Florida for a day or two before and after his cruise.

148.  Mr. Doe #2 would like to travel in the U.S. and internationally, but he distrusts the information he gets from law enforcement and he is afraid that he will make a mistake with his reporting requirements and be prosecuted for a felony.

149.  Plaintiff John Doe #3 tries to report everything he thinks he may need to report. For example, he has his own vehicle, but also reports his parents' vehicle because he occasionally drives it and isn't sure whether he needs to report it.

150.  Plaintiff John Doe #4 is fearful of using any vehicle that is not registered to him. When his car breaks down, he does not borrow a vehicle from friends or family because he is uncertain whether he would have to register it. His family owns a boat, but Mr. Doe #4 does not use it, because he is uncertain about whether or how often he could use it without being required to register it. Similarly, his brothers own ATVs; when the family goes camping, Mr. Doe #4 does not take out the ATVs because he is unclear about whether he would then have to register them.

151.  Mr. Doe #4 drives multiple company vehicles. One of his employers had about 30 vehicles and his current employer has about 4. When Mr. Doe #4 inquired at his local police station if he needed to register all of these vehicles, the police did not know and so they called the state police.

152.  The state police said he did not have to register them, but that the local police should put a note in his record. Mr. Doe #4 has no written confirmation of this in his own records, and is fearful when he drives his employers' vehicles that he could be violating SORA. He also does not know whether he needs to register the construction equipment he drives, which his employer typically rents for a couple days or for the length of a construction job.

31

153.  Mr. Doe #4 is a good driver, but if the weather is bad and his friends or family ask him to drive due to the snow, he declines because he does not know whether driving their vehicles would be a violation of SORA. Similarly, when he goes out with friends and they ask him to drive because they have been drinking and he has not, he again does not drive because that could be a violation of SORA.

154.  Plaintiff John Doe #6 has registered four vehicles that his family owns. As with everything having to do with SORA, he errs on the side of caution and restricts or limits his behavior to be certain that he is not violating the law.

### The State's Continued Enforcement of SORA's Internet Reporting Requirements in Violation of the First Amendment

155.  SORA severely restricts the plaintiffs' and putative class members' ability to speak freely on the internet. They must provide law enforcement with all electronic mail addresses, instant message addresses, log-in names, or other identifiers that are assigned to or routinely used by them, M.C.L. § 28.727(1)(i). In addition, they must report in person within three days whenever they establish any electronic mail address, instant message address, or other designation used in internet communications or postings. M.C.L. § 28.725(1)(f).

156.  This Court held in 2015 that SORA's provisions requiring immediate in-person reporting of certain electronic information and SORA's retroactive incorporation of the lifetime registration requirement for certain electronic information violate the First Amendment.

157.  Nevertheless, the defendants continue to require the plaintiffs John Does #1-6 and the putative class members to comply with those SORA provisions. The Explanation of Duties informs registrants that they must immediately report in person "any electronic mail (e-mail address), instant messaging address, or any other designation used in internet communications upon establishing it." *See* Exhibit H.

158.  The plaintiffs and putative class members fear using the internet because SORA is unclear about whether, for example, they must report immediately and in person if they set up an on-line account to facilitate basic transactions such as the payment of taxes, registration with media streaming services, or purchases on web-sites like Amazon.

159.  Plaintiff John Doe #1 restricts his internet use because he must report in person within three days every time he creates a new internet account. Once he was automatically assigned a new account when signing up for a service; to be safe he had to go to the registration office within three days to report it.

160.  Plaintiff Doe #2 is afraid to use the internet because he must provide all email and internet identifiers. For the most part Mr. Doe #2 avoids social media and accounts that would require him to register within three days. His attitude is that he would rather be safe than sorry, and that it is safest to limit his internet use than to risk compliance issues with SORA.

33

161.  Mr. Doe #2 works at a bank and he recently completed an on-line MBA. He would have preferred to attend a bricks-and-mortar school, but to do so he would have had to register with the school and place the school on the registry. He was also worried about not knowing what he would have to report with regard to in-class or group assignments involving immediate on-line research or searches.

162.  Plaintiff John Doe #3 is reluctant to use the internet, and no longer maintains a social media profile on Facebook, Twitter, or social media sites, due to SORA's reporting and registration requirements. He tries not to use any chat or instant messaging functions on the internet, because that can require creating a screen name, which then triggers a reporting requirement. His father died in December, and he wanted to participate in on-line grief support, but would have had to register his screen name so he chose not to participate.

163.  Plaintiff John Doe #4 limits his use of the internet because he does not want to create new electronic identifiers that would require him to take time off work to go report in person. He does not know what electronic identifiers he has to report. He does not use social media. He is currently enrolled in an online MBA program, and is concerned about whether he will have to create and report new identifiers in that program.

164.  Plaintiff John Doe #5 avoids all internet websites that require a username and severely restricts his internet use because he is unsure what information he

34

must report and does not want to report in person each time he creates a new identifier. For example, he is interested in advocacy on LGBT issues and would like to comment on websites related to these issues. But he does not do so because that requires creating an account and then registering it in person with the police.

165.  Plaintiff John Doe #6 gave up his Facebook account as soon as he was told that he would have to report it. He does not understand what he must report and when, and so he limits his internet use rather than risking making a mistake and putting himself in jeopardy of being prosecuted for noncompliance.

### The State's Continued Enforcement of
### SORA's Strict Liability Provisions

166.  SORA imposes penalties of up to 10 years imprisonment for violations of the Act. M.C.L. §§ 28.729(1); 28.734(2); 28.735(2).

167.  Plaintiffs John Does #1-6 and the putative class members remain strictly liable for certain SORA violations, meaning that despite the absence of any intention to violate the law, they will be held strictly liable for any failure to comply.

168.  The plaintiffs fear that despite their best efforts to understand and comply with the law, they will be held liable for unintentional violations of SORA, absent the protections of the *Does #1-5* decisions being extended to them. The putative class members are in the same quandary.

169.  Plaintiff John Doe #1 simply avoids certain activities due to the fear of prosecution for something that he may not have known. Mr. Doe #1's daily life is

35

fairly routine because of his restrictions on the places that he can go. Mr. Doe #1 also has been at his job for a number of years and does not want to risk losing it because of a mistake regarding SORA's complex reporting requirements.

170. Plaintiff John Doe #2 always errs on the side of caution, in effect policing himself because he does not want to risk prosecution for an inadvertent violation and lose everything that he has worked so hard to attain over the years.

171. Plaintiff John Doe #3's developmental disabilities make it difficult for him to comply with SORA's complex reporting requirements. He fears that he will inadvertently fail to comply with SORA, despite his best efforts to do so.

172. Plaintiff John Doe #4 tries very hard to comply with SORA, but is often unclear about what his obligations are. If he does not know whether something is allowed, he simply does not do it. He fears that despite his best efforts he will violate SORA.

173. Plaintiff John Doe #5, too, always errs on the side of caution. Although he is compliant, he fears that a piece of paperwork or record may show that he is not compliant based upon a mistake or something he didn't know about, and that he will be charged with a violation.

174. Plaintiff John Doe #6 has a lot to lose because he and his family run a successful restaurant business. Although he is the patriarch, his role in the business has been severely limited because he is afraid that he will mistakenly do something

wrong and his error will come to the attention of law enforcement.

## CLASS ALLEGATIONS

175.  The plaintiffs bring this action on behalf of themselves and all similarly situated persons pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

176.  The plaintiffs seek certification of a "primary class," defined as people who are or will be subject to registration under Michigan's SORA.

177.  The plaintiffs also seek certification of an "ex post facto subclass," defined as members of the primary class who committed the offense or offenses requiring registration before April 12, 2011.

178.  The proposed primary class and the proposed subclass both satisfy the requirements of Fed. R. Civ. P. 23(a).

179.  First, the class and subclass are each so numerous that joinder of all members of the class is impracticable.

180.  There are almost 44,000 persons subject to registration under SORA, and the registry grows by about 2,000 additional people a year. All of these individuals are members of the primary class.

181.  There are tens of thousands of registrants who committed the offense(s) which subject them to registration before April 12, 2011, the effective date of the 2011 SORA amendments. Those individuals are all members of the ex post facto subclass (with the possible exception of a small number of people who have won

some judicial relief through a separate action), and their joinder is impracticable.

182.  Joinder is also impracticable because registrants are scattered all across the state.

183.  Many registrants are indigent and would be unable to retain counsel to secure their rights under *Does I* absent a class action.

184.  The names and number of class members and subclass members are ascertainable based on the defendants' records.

185.  Proceeding under Rule 23 will promote the fair and efficient adjudication of this action because it will permit a large group of similarly-situated persons to prosecute their common claims simultaneously in a single forum, without duplicating evidence, and save the additional effort and expense that would otherwise be necessary if their claims were brought through a series of individual actions.

186.  Already dozens of Michigan registrants have filed SORA cases in a variety of state and federal courts seeking to enforce *Does I*. Judicial economy will be served by handling common issues related to the enforcement of *Does I* through class-wide proceedings.

187.  Second, there are questions of law or fact common to the proposed primary class and the proposed subclass. The common questions of law and fact include, but are not limited to:

> a.  Whether SORA's prohibitions on working, residing, or "loitering" within a "student safety zone," and SORA's reporting requirements, are uncon-

38

stitutionally vague, and therefore cannot be applied to registrants;

b. Whether SORA's internet reporting requirements violate the First Amendment;

c. Whether registrants can be held strictly liable for any violations of SORA;

d. Whether retroactively applying the 2006 and 2011 SORA amendments to registrants whose offenses predate those amendments violates the Ex Post Facto Clause of the U.S. Constitution;

e. Whether the 2011 SORA amendments are severable, and if not, whether SORA can be enforced against registrants whose offenses predate those amendments.

188.  Third, the claims asserted by plaintiffs John Does #1-6 are typical of the claims of the class members whom they seek to represent. The same common course of conduct by the defendants gave rise to the plaintiffs' and the class members' claims.

189.  Fourth, the plaintiffs will fairly and adequately protect the interests of the respective class members. The plaintiffs' interests are coincident with, and not antagonistic to, those of the respective class members.

190.  The plaintiffs are represented by competent counsel who are experienced in prosecuting civil rights and class action litigation and include the counsel who litigated *Does I*, the class-wide enforcement of which is at issue in this case.

191.  The proposed classes also satisfy the requirements of Fed. R. Civ. P. 23(b)(2) because the defendants have acted or refused to act on grounds that apply generally to the class members, warranting appropriate declaratory and injunctive

relief as to each class.

## Incorporation of the Facts Set Forth Above

192.  For all of the legal claims set forth below, the plaintiffs re-allege the facts described in the paragraphs above and incorporate those facts by reference into the legal claims.

## CLAIMS FOR RELIEF

## COUNT I

## Violations of the Due Process Clause: Vagueness

193.  The Due Process Clause of the Fourteenth Amendment prohibits states from enforcing laws that are unconstitutionally vague. As a matter of due process, statutory requirements must be written with sufficient specificity that persons of ordinary intelligence need not guess as to their meaning and will not differ as to their application.

194.  For the reasons set out in this Court's decision in *Does #1-5 v. Snyder,* 101 F. Supp. 3d 672 (E.D. Mich. 2015), the following provisions of SORA are uncon-stitutionally vague, and therefore cannot be enforced under the Due Process Clause:

   a.  the prohibition on working within a student safety zone, M.C.L. § 28.733-734;
   b.  the prohibition on loitering within a student safety zone, M.C.L. § 28.733-734;
   c.  the prohibition on residing within a student safety zone, M.C.L. § 28.733 & § 28.735;

d.   the requirement to report "[a]ll telephone numbers ... routinely used by the individual, M.C.L. § 28.727(1)(h);

e.   the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual, M.C.L. § 28.727(1)(l); and

f.   the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel . . . regularly operated by the individual," M.C.L. § 28.727(1)(j).

195.  The plaintiffs bring the due process vagueness claim for themselves and on behalf of the primary class.

## COUNT II

### Violations of the Due Process Clause: Strict Liability

196.  The Due Process Clause limits the use of strict liability in the criminal law.

197.  This Court in *Does #1-5*, held that "[a]mbiguity in the Act, combined with the numerosity and length of the Act's provisions make it difficult for a well-intentioned registrant to understand all of his or her obligations," and concluded that a knowledge requirement is necessary "to ensure due process of law." 101 F. Supp. 3d at 693.

198.  The plaintiffs bring the due process strict liability claim for themselves and on behalf of the primary class.

## COUNT III

### Violations of the First Amendment

199.  The First Amendment prohibits abridgement of the freedom of speech. The Fourteenth Amendment incorporates the First Amendment against the states.

200.  For the reasons set out in this Court's decision in *Does #1-5 v. Snyder,* 101 F. Supp. 3d 672 (E.D. Mich. 2015), and 101 F.Supp.3d 722 (E.D. Mich. 2015), the following provisions of SORA violate the First Amendment:

    a.  the requirement "to report in person and notify the registering authority ... immediately after … [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," M.C.L. § 28.725(1)(f); and

    b.  the retroactive incorporation of the lifetime registration requirement's incorporation of the requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," M.C.L. § 28.727(1)(i).

201. The plaintiffs bring the First Amendment claim for themselves and on behalf of the primary class.

## COUNT IV

## Violation of the Ex Post Facto Clause

202.  The retroactive application of the 2006 and 2011 amendments violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, under the Sixth Circuit's decision in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) ("*Does I*").

203.  Under the Sixth Circuit's decision in *Does I*, the 2006 and 2011 SORA amendments cannot be retroactively applied to plaintiffs John Does #1-5.

204.  The 2011 SORA amendments cannot be severed from SORA because the unconstitutional portions are so entangled with the other sections that they cannot be removed without adversely affecting the operation of the act. As a result, there

is no statute in effect that lawfully imposes restrictions and obligations based on conduct occurring before April 12, 2011.

205.  The defendants are unlawfully requiring plaintiffs John Does #1-5 and members of the putative ex post facto subclass to register as sex offenders and to comply with SORA, even though that statute is null and void as applied to them.

206.  The plaintiffs bring the ex post facto claim for themselves and on behalf of the ex post facto subclass.

### Lack of a Legal Remedy

207.  The plaintiffs and the putative class members' harm is ongoing, and cannot be alleviated except by declaratory and injunctive relief.

208.  No other remedy is available at law to apply and enforce the *Does I* decisions to Michigan registrants going forward, and to ensure that constitutional conduct is not barred outright or deterred by the risk of future prosecution.

### REQUEST FOR RELIEF

Wherefore, the plaintiffs, for themselves and for the putative class members whom they wish to represent, ask the Court to grant the following relief:

A. Rule that this action may be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, and certify:

1. a "primary class," defined as people who are or will be subject to registration under Michigan's Sex Offenders Registration Act, and name plaintiffs John Does #1-6 as representatives of the primary class; and

2. an "ex post facto subclass," defined as members of the primary class who

committed the offense or offenses requiring registration before April 12, 2011, and name plaintiffs John Does #1-5 as representatives of the ex post facto subclass.

B. Appoint the plaintiffs' counsel (Miriam Aukerman, Alyson Oliver, and Paul Reingold) as class counsel.

C. Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, consistent with *Does #1-5*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), that the following provisions of SORA are unconstitutionally vague, and permanently enjoin the defendants from enforcing them against the plaintiffs and members of the primary class:

    1. the prohibition on working within a student safety zone, M.C.L. §§ 28.733-734;

    2. the prohibition on loitering within a student safety zone, M.C.L. §§ 28.733-734;

    3. the prohibition on residing within a student safety zone, M.C.L. § 28.733 and § 28.735;

    4. the requirement to report "[a]ll telephone numbers . . . routinely used by the individual, M.C.L. § 28.727(1)(h);

    5. the requirement to report "[a]ll electronic mail addresses and instant message addresses . . . routinely used by the individual, M.C.L. § 28.727(1)(l); and

    6. the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel . . . regularly operated by the individual," M.C.L. § 28.727(1)(j).

D. Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, consistent with *Does #1-5*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), that under the Due Process Clause of the United States Constitution, SORA must be interpreted as incorporating a knowledge requirement and permanently enjoin the defendants from holding the plaintiffs or members of the primary class strictly liable for SORA violations.

E. Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, and consistent with *Does*

*#1-5 v. Snyder,* 101 F. Supp. 3d 672, and 101 F. Supp. 3d 722 (E.D. Mich. 2015), that the following provisions of SORA violate the First Amendment of the United States Constitution, and permanently enjoin the defendants from enforcing these provisions against the plaintiffs and members of the primary class:

1. the requirement "to report in person and notify the registering authority ... immediately after … [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," M.C.L. § 28.725(1)(f);

2. the retroactive incorporation of the lifetime registration requirement's incorporation of the requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," M.C.L. § 28.727(1)(i).

F. Declare, pursuant to 28 U.S.C. §§ 2201 and 2202 and consistent with *Does #1-5*, 834 F.3d 696 (6th Cir. 2016), that the 2006 and 2011 SORA amendments constitute punishment and cannot be applied retroactively to registrants who committed their registrable offense before the effective dates of those acts, and permanently enjoin the defendants from enforcing the 2006 and 2011 amendments against plaintiffs John Does #1-5 and members of the ex post facto subclass.

G. Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that the 2011 amendments cannot be severed from SORA, and that the statute therefore is null and void as applied to people who are subject to registration based on offenses under Michigan's Sex Offenders Registration Act committed before April 12, 2011; and permanently enjoin the defendants from enforcing SORA against plaintiffs John Does #1-5 and members of the ex post facto subclass.

H. Grant the plaintiffs and all class members their costs of suit, their attorneys' fees and costs as permitted under 42 U.S.C. § 1988, and any other costs or expenses allowed by law; and

I. Grant such other relief as justice requires.

Dated: June 28, 2018          Respectfully submitted,

 s/ Alyson L. Oliver (P55020)
OLIVER LAW GROUP P.C.
363 W. Big Beaver Rd., Suite 200
Troy, MI 48226
Tel. (248) 327-6556
Fax: (248) 436-3385
E-mail: notifications@oliverlg.com
*Attorneys for Plaintiffs*

s/ Miriam Aukerman (P63165)
American Civil Liberties Union
  Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
Email: maukerman@aclumich.org

s/ Paul D. Reingold (P27594)
Michigan Clinical Law Program
Attorney for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
Email: pdr@umich.edu

s/ Michael Steinberg (P43085)
American Civil Liberties Union
  Fund of Michigan
Attorney for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
Email: msteinberg@aclumich.org

**Proof of Service**

On this date the plaintiffs' second amended verified class action complaint was filed using the court's ECF system, which will send same-day email notice to all counsel of record.

s/ Alyson L. Oliver (P55020)
Attorney for Plaintiffs

Dated: June 28, 2018